# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

RICHARD WATKINS,
    Plaintiff,

vs.

ROBERT WILKIE,
SECRETARY, DEPARTMENT OF
VETERANS AFFAIRS
    Defendant.

Case No. 1:17-cv-531
Litkovitz, M.J.

**ORDER**

## I. Introduction

Plaintiff Richard Watkins brings this action against his employer, the Department of

Veterans Affairs ("VA"), alleging that he was subjected to a racially hostile work environment

and was retaliated against in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e *et seq.*[1] and 42 U.S.C. § 1981. This matter is before the Court on defendant's motion for

summary judgment (Doc. 29), plaintiff's response in opposition (Doc. 30), defendant's reply

memorandum (Doc. 43), and plaintiff's sur-reply (Doc. 50).

## II. Facts on Summary Judgment

The following facts are undisputed except where noted.

Plaintiff is a fifty-one-year-old African American male. He began his employment with

defendant as a pharmacy technician at the Cincinnati VA Medical Center in 1991. (Deposition

of Plaintiff Richard Watkins, Doc. 31 at 20, 22). From approximately 1996 to 2002, plaintiff

held a position in labor relations and employee relations at the VA. (*Id.* at 26-27). In 2002, the

---

[1] In his brief in opposition, plaintiff does not make an argument opposing defendant's motion for summary judgment
on his race discrimination claim. In his sur-reply, he does not reply to defendant's argument in its reply brief that
plaintiff "abandoned his claim alleging discrimination on the basis of race, asserting that material issues of fact
remain only as to his hostile work environment and retaliation claims." Accordingly, for the reasons set forth in
defendant's motion, summary judgment is granted for defendant on plaintiff's race discrimination claim.

VA promoted plaintiff to the position of employee relations specialist out of the VA's central office in Washington, D.C. (*Id.* at 30). In 2007 or 2008, the VA promoted plaintiff to GS-14 labor relations specialist, a position that he still holds. (*Id.* at 31). Although employed by the VA central office in Washington, D.C., plaintiff teleworks from home in Liberty Township, Ohio. (*Id.* at 40). In mid-2015, the VA appointed Don Stephen to serve as plaintiff's temporary supervisor for 120 days, from approximately June to October 2015. (Deposition of Don Stephen, Doc. 36 at 25-26). After returning to his non-supervisory position, Stephen was promoted to a permanent supervisory position in April 2016 and served as plaintiff's supervisor again from April 2016 until late 2016. (*Id.*; Watkins Depo. at 37). Kimberly Moseley, who is African-American, served as plaintiff's second-level supervisor. (Deposition of Kimberly Moseley, Doc. 38 at 13). Ms. Moseley held the position of Senior Executive Services, Executive of Labor Relations. (*Id.* at 10).

## A. Racial Slur Incidents in 2015

Plaintiff asserts that sometime in 2015, his co-worker Ashley Levesque, who is Caucasian, made racially offensive statements in his presence. The first incident occurred at a bar during an after-hours work event. When discussing his recent travels to Asia, an unidentified individual[2] said to plaintiff, "I bet you were like King Kong over there because you are so tall." (Watkins Depo. at 65-66). Ms. Levesque later said to plaintiff at the bar, "you let her call you a monkey, you let her call you an ape." (*Id.* at 66). According to defendant's interpretation of the incident, Ms. Levesque was personally offended when she overhead the statement and told plaintiff that he should not have let the individual "call [him] a monkey." (Doc. 29 at 8). Ms. Moseley testified in her deposition that she talked to plaintiff after the incident and asked what

---

[2] Plaintiff identifies the individual as a co-worker. (Doc. 30 at 2). Defendant identifies the individual as an "unidentified non-VA employee." (Doc. 29 at 8).

happened. (Moseley Depo. at 32). Plaintiff responded: "It's okay. Ashley just made a big deal of it. It was not a big deal." (*Id.*).

The second incident occurred at an office meeting in late 2015 or early 2016 where Ms. Levesque referred to another co-worker as a "nigger" in a conversation with plaintiff. (Watkins Depo. at 67, 107). Plaintiff testified that other than these comments made by Ms. Levesque, he never heard anyone else use a racial slur in the workplace in his 25 years of service at the VA. (*Id.* at 84). However, as reported by other VA employees, Ms. Levesque directed racial slurs at other coworkers on other occasions, which included calling African-American employee Timothy Woodard a "nigger" and African-American supervisor Janis Tullis a "monkey." (Woodard Decl., Doc. 34 at ¶¶ 7-8). Anitra Jones, an African American staff assistant, witnessed Ms. Levesque call Mr. Woodard a "nigger." (Deposition of Anitra Jones, Doc. 39 at 19-20). However, Ms. Moseley testified that longtime VA employee Melissa Paul, also known as Melissa Best, was the individual who directed the racial slur towards Timothy Woodard and her remark was overheard by Ms. Levesque, who in turn reported it to Janis Tullis, who then reported it to Ms. Moseley. (Moseley Depo. at 17-18). Thus, the parties dispute whether Ms. Levesque or Ms. Best directed the racial slur towards Mr. Woodard.

Although he could not recall the exact date, plaintiff testified that he orally notified Ms. Moseley of the racial slurs made by Ms. Levesque at the bar and the meeting. (Watkins Depo. at 67-68). Plaintiff testified that he was "almost sure" but did not know specifically whether his allegations regarding Ms. Levesque were reported before or after his October 2015 performance evaluation. (*Id.* at 108-09). Ms. Moseley testified that she did not recall any reports in 2015 against Ms. Levesque accusing her of making racially discriminatory statements. (Moseley Depo. at 15). Ms. Best attests that she was aware that Ms. Levesque frequently used the word

"nigger" in the workplace while employed by the VA. (Best Affidavit, Doc. 35 at ¶ 5). Ms. Best reported the use of racial slurs by Ms. Levesque to Ms. Moseley and Gina Farrisee, Assistant Secretary of Human Resources. (*Id.* at ¶ 6). However, Ms. Moseley testified at her deposition that Ms. Best reported to her that Ms. Levesque's first remark at the bar was made because she was standing up for plaintiff and was personally offended by the King Kong comment. (Moseley Depo. at 30-33). Later, Ms. Best informed Evester Edd of Ms. Levesque's statements during a 2015 formal workplace investigation. (Best Affidavit at ¶ 6). Mr. Stephen testified that he first learned of the racial slur incidents at the informal mediation phase of plaintiff's EEO complaint when he was no longer a supervisor of plaintiff or anyone else. (Stephen Depo. at 22, 24). However, plaintiff believes that Mr. Stephen was aware of these allegations at the time of his performance evaluation in October 2015. Plaintiff also sent a letter to Congressman John Boehner, then-Speaker of the United States House of Representatives, informing his office of racially offensive language used at the VA. (Watkins Depo. at 71-72). Speaker Boehner's office informed plaintiff that they sent a letter to the VA Secretary addressing his concerns. (*Id.* at 72). The VA Secretary responded that plaintiff needed to file a complaint with the Equal Employment Opportunity "EEO" office. (*Id.*).

In February 2015, Ms. Moseley requested a formal fact-finding to address the number of concerns brought to her attention. (Doc. 29-1 at 54-55; Moseley Depo. at 21). One issue addressed during the investigation was a concern that Ms. Levesque had improperly removed personnel documents from Mr. Woodard's desk. (Moseley Depo. at 22-23). Ms. Moseley testified that another triggering event of the investigation was Ms. Levesque's complaint that Ms. Best used a racial slur. (*Id.* at 24). Plaintiff also testified that the investigation involved Ms. Best's use of a racial slur. (Watkins Depo. at 74). The investigation was conducted by Evester

Edd. (Jones Depo. at 17). During the investigation, plaintiff informed Edd that Ms. Levesque used racial slurs in the workplace and used the "N-word" at the meeting. (Watkins Depo. at 74, 79).[3]

## B. Plaintiff's 2015 Performance Evaluation

On October 16, 2015, Mr. Stephen, as plaintiff's interim supervisor, conducted a 2015 fiscal year annual performance evaluation. (Doc. 29-1 at 69-79). According to plaintiff, Mr. Stephen and Ms. Levesque had a very close relationship and were friends. (Watkins Depo. at 70). Plaintiff received an overall performance rating of "excellent," which was lower than the highest rating of "outstanding" that plaintiff received for the 2014 fiscal year. (Doc. 29-1 at 73; Doc. 31-1 at 5). Plaintiff received a rating of "fully successful" rather than a perfect rating of "exceptional" on the element of teamwork. (Doc. 29-1 at 72). Although Mr. Stephen could not recall any specific interactions with plaintiff warranting the "fully successful" rating in this area, Mr. Stephen testified that he based the rating on plaintiff's self-assessment and the observations that he made as plaintiff's interim supervisor for 120 days. (Stephen Depo. at 43-45). Plaintiff did not file a grievance related to his evaluation. (Watkins Depo. at 102). The evaluation had no negative financial impact on plaintiff. (*Id.* at 129). Plaintiff was not terminated, demoted, or disciplined as a result of his 2015 evaluation. (*Id.* at 128).

Although plaintiff's evaluation was mostly positive, the record shows that his supervisors did have some concerns about his work. For example, in April 2015, Ms. Moseley returned an assignment to plaintiff and explained that it needed additional work. (Doc. 29-1 at 95). Mr. Stephen asked for updates on the status of the assignment in August and September 2015. (*Id.* at

---

[3] Plaintiff's deposition testimony reveals a slight ambiguity on the timing of when Ms. Levesque allegedly used the "N-word" at the office meeting. Plaintiff testified that he believed Ms. Levesque used the "N-word" at an office meeting in late 2015 or early 2016. However, he also testified that he reported the use of this racial slur to Mr. Edd during the fact-finding investigation, which began in February 2015.

93-94). In addition, in early September 2015, Mr. Stephen requested that plaintiff write a white paper in preparation for a mandatory training for management and certain employees. (Doc. 29-1 at 106). After an initial submission, Mr. Stephen asked plaintiff to "re-work" the document a little bit and "give a more comprehensive explanation of the issue at hand." (*Id.* at 105). Unclear about expectations for the assignment, plaintiff asked questions about the assignment to the point that Mr. Stephen eventually offered to complete it himself. (*Id.* at 104-05). Plaintiff declined Mr. Stephen's offer. (*Id.* at 103). At the end of September 2015, Mr. Stephen informed plaintiff that he needed a finished product of the assignment by October 6, 2015. (*Id.* at 101). Plaintiff responded that he was on travel until October 12, 2015 and could not meet this "unreasonable deadline." (*Id.*).

### C. Plaintiff's Workload

In October 2015, the VA hired Roy Ferguson, a Caucasian male, as an employee relations specialist. (Stephen Depo. at 71; Declaration of Roy Ferguson, Doc. 29-6 at ¶ 3). Mr. Ferguson and plaintiff held the same title, but in 2015 and early 2016, Ferguson was a GS-13 employee and plaintiff was a GS-14 employee. (Watkins Depo. at 133). Plaintiff believed that Mr. Stephen assigned him a heavier workload than Mr. Ferguson. A snapshot of the VA's assignment tracking system from July 2015 through June 15, 2016 shows that plaintiff had thirty-five assignments in the system while Mr. Ferguson had only twelve assignments in the system. (Doc. 29-1 at 107-110). Plaintiff testified that 99% of the time his assignments were reflected in the tracker system. (Watkins Depo. at 135). Employees are required to "clear" assignments from the tracker when they are completed. (*Id.* at 138). Plaintiff testified that he does not always clear assignments from the tracker as soon as they are completed. (*Id.*). Plaintiff did not know whether Ferguson's tracker was accurate. (*Id.* at 137).

Mr. Stephen testified that it is not possible to judge an employee's workload solely by looking at the tracking system list. (Stephen Depo. at 128-29). Plaintiff's list included projects assigned on dates when Mr. Stephen was not plaintiff's supervisor, as well as projects assigned prior to Mr. Ferguson's hiring. (*Id.*). The list also included assignments that plaintiff did not properly close out upon completion. (*Id.* at 77). Specifically, Mr. Stephen testified: "what's on this list as open active is really a lack on Mr. Watkins' part of properly closing out his work when it's completed." (*Id.*). The list also did not include new employee trainings that Mr. Ferguson attended. (*Id.* at 81). The list is also not reflective of the complexity of work assigned. (*Id.* at 79-81). A later printout from the VA's assignment tracking system from the summer of 2016 shows that Mr. Stephen assigned plaintiff fewer assignments than Mr. Ferguson. (Doc. 29-1 at 111-12).

### D. Dayton VA Medical Center Assignment

In June 2016, the VA scheduled a collaborative training session between the VA and the employees' union to take place at the Dayton VA Medical Center. (Watkins Depo. at 152-153). In collaborative training sessions, VA management selects one trainer and the union selects a separate trainer. (*Id.* at 153). The trainers are responsible for training the facility—union and management together—in a collaborative setting regarding applicable executive orders on labor management relations. (*Id.* at 152). Mr. Stephen assigned plaintiff to be the trainer for VA management. (Stephen Depo. at 85). According to Ms. Moseley, individuals who are the most geographically conveniently located are usually assigned to deliver the training. (Moseley Depo. at 50-51). Because the training request was in Ohio and plaintiff teleworked from home in Ohio, plaintiff was assigned to deliver the joint training with the union trainer in Dayton. (*Id.*).

In an email to Mr. Stephen, plaintiff stated that he would prefer if Stephen found someone else to conduct the training. (Doc. 29-1 at 118). Mr. Stephen responded that he did not have anyone else to send to the facility to conduct the training, and plaintiff would therefore be assigned. (*Id.*). Plaintiff responded that this was "a major problem" and the training would be a "disaster." (*Id.* at 117). Mr. Stephen responded and asked plaintiff to address his specific concern. (*Id.*). Plaintiff stated that he had already expressed his concerns on at least four occasions but reiterated that there was a "professional conflict" with the assignment because his ex-wife worked at the Dayton VA Medical Center. (*Id.*). Plaintiff responded to Mr. Stephen: "You are the boss and of course I won't refuse an assignment. However, I think this is a big mistake." (*Id.*). Mr. Stephen spoke with Ms. Moseley regarding plaintiff's concerns, but they determined that plaintiff's request could not be accommodated. (*Id.* at 116). Mr. Stephen instructed plaintiff to make travel arrangements in order to provide the training as assigned. (*Id.*). Mr. Stephen again informed plaintiff that he could not find another trainer for the assignment and that all possibilities had been exhausted. (*Id.*). Mr. Stephen said it would be fine if plaintiff found someone to fill in on short notice. (*Id.*). Plaintiff never specifically explained how his ex-wife's attendance at the training would be a conflict of interest. (Watkins Depo. at 156). Plaintiff stated: "In my mind, that's obvious. But maybe in someone else's mind, it's not obvious." (*Id.*). There was no protective order or other legal reason preventing plaintiff and his ex-wife from being in the same location. (*Id.*). Mr. Stephen could not perceive any conflict of interest because the training was collaborative between the union and management. (Stephen Depo. at 90).

Tinita Cole, the union president, reached out to Mr. Stephen and indicated that she was concerned about a conflict of interest if plaintiff were to conduct the training. (Stephen Depo. at

88-89). According to Mr. Stephen, Ms. Cole was worried that plaintiff's ex-wife would be uncomfortable with plaintiff going to the training. (*Id.* at 89). Ms. Cole did not want plaintiff to conduct the training because the training was requested to address the strained relationship between management, including plaintiff's ex-wife, and the local union leadership. (Deposition of Tinita Cole, Doc. 32 at 13-15, 30). The union was worried that plaintiff would be "too friendly" to his ex-wife in conducting the training. (*Id.* at 35). In addition, the union was concerned that plaintiff's assignment as the trainer violated an informal understanding between the union and management that individuals would not be assigned to conduct trainings in "their own area." (Doc. 32-1). Mr. Stephen responded that plaintiff was a national VA employee and had never worked in Dayton. (*Id.*). However, plaintiff had previously conducted trainings in Columbus. (Cole Depo. at 36). As a result of this discussion with the union, Mr. Stephen spoke with the Director of the Dayton VA Medical Center and confirmed that plaintiff's ex-wife was fine with plaintiff acting as the management trainer. (Doc. 29-1 at 113).

Plaintiff was ultimately required to conduct the Dayton training. However, two days before the scheduled training, on June 21, 2016, plaintiff requested sick leave until July 1, 2016. (Doc. 29-1 at 119-20). Mr. Stephen informed plaintiff that his sick leave request was denied because the VA did not accept medical excuse notes from physician assistants. (*Id.*). The following day, plaintiff emailed Mr. Stephen stating that he believed his sick leave request and accompanying documentation were compliant with VA policy and controlling regulations. (*Id.*). In response, Mr. Stephen noted that Human Resources provided him with additional information supporting plaintiff's request and therefore he was authorized to accept plaintiff's medical statement and request for sick leave. (*Id.* at 122).

### E. Plaintiff's 2016 Performance Evaluation

In late 2016, plaintiff requested that the VA reassign him to a different supervisor. (Watkins Depo. at 37). Larry Bennett became plaintiff's new supervisor. (*Id.*). However, Mr. Stephen conducted plaintiff's performance evaluation for the fiscal year ending on September 30, 2016. Plaintiff received an overall rating of "fully successful" and "exceptional" ratings in three out of four performance categories. (Doc. 29-1 at 135, 141). In a narrative description of plaintiff's performance, Mr. Stephen wrote that plaintiff went above and beyond to provide training to facilities on very short notice, consistently managed his work in an organized fashion, and had engaged in self-directed and self-motivated learning. (*Id.* at 137). Plaintiff testified that these comments were positive, yet it did not matter because he was given an overall rating of "fully successful." (Watkins Depo. at 186).

In giving plaintiff a lower rating of "fully successful" in the area of customer service, Mr. Stephen testified that he considered internal communications to be a part of customer service. (Stephen Depo. at 58). Mr. Stephen testified that plaintiff failed communicate with him on a professional level and refused to return calls or speak to him. (*Id.* at 57-58). By June 2016, Mr. Stephen considered giving plaintiff counseling about his frequent pushback and noncompliance with assigned work. (*Id.* at 120). However, Mr. Stephen did not ultimately propose discipline. (*Id.*). The 2016 fiscal year evaluation had no adverse financial or work-related impact on him. (Watkins Depo. at 192). Plaintiff chose not to file a grievance regarding this evaluation. (*Id.*).

### F. Plaintiff's EEO complaint

On November 10, 2015, plaintiff made a timely report to an EEO counselor. On or about February 17, 2016, plaintiff filed a formal EEO complaint with the VA's Central Office Human Resources Department. During the investigation of his formal EEO complaint, plaintiff reported

that the basis for his retaliation complaint was the 2015 performance evaluation, the heavier

workload, and the training assignment at the Dayton VA Medical Center that he believed to be a

conflict of interest. (Doc. 29-1 at 81). Plaintiff stated that these actions were taken in retaliation

for his "filing of an EEO complaint and reporting to the Secretary that Donald Stephen['s] friend

was using the 'N' word in the workplace and referring to African American employees as

'monkeys.'" (*Id.*). Following the investigation, the VA's Office of Employment Discrimination

Complaint Adjudication issued a final agency decision dismissing plaintiff's EEO complaint and

issuing a right to sue notice. (Doc. 1-1).

## III. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court

demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled

to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule

of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue of material fact and the moving party is entitled to judgment as a matter

of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate

the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving

party. *Satterfield*, 295 F.3d at 615; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S.

574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at

249. The trial court need not search the entire record for material issues of fact, *Street v. J.C.*

*Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the non-moving party to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 587 (emphasis in original). To meet that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. Resolution

### A. Retaliation Claim

In considering plaintiff's retaliation claims brought under 42 U.S.C. § 1981 and Title VII, the Court utilizes the same analytical framework applied to claims under Title VII. *Allen v. Ohio Dep't of Job & Family Servs.*, 697 F. Supp. 2d 854, 879 (S.D. Ohio 2010). Title VII prohibits an employer from retaliating against an employee by taking an adverse employment action against the employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42

U.S.C. § 2000e–3(a); *see also* 29 C.F.R. § 1614.101(b). The retaliation provision "protects employees from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 62-67 (2006)). To establish a prima facie case of retaliation under Title VII, a plaintiff must prove that: (1) he engaged in a protected activity; (2) his exercise of the protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (internal citations omitted).

Under this standard, plaintiff bears the initial burden of establishing a prima facie case of retaliation. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). If the plaintiff proves all elements of his prima facie case, the burden then shifts to the defendant to "articulate some legitimate, non-discriminatory reason for its actions." *Id.* Once the defendant provides its legitimate, non-discriminatory reason, the plaintiff must show that the proffered reason is mere pretext for unlawful retaliation. *Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 827 (6th Cir. 2019). A plaintiff asserting a retaliation claim under § 2000e-3(a) must establish that his protected activity was a but-for cause of the alleged adverse action by the employer. *Univ of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 351-52 (2013). That is, the plaintiff must show that "[t]he unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

Plaintiff argues that the VA retaliated against him after he made an informal complaint about the use of racially offensive language in the workplace and filed a formal EEO complaint

by giving him downgraded performance evaluations in 2015 and 2016, by assigning him a heavier workload than his similarly-situated Caucasian colleague (Mr. Ferguson), and by assigning him to conduct a training at the Dayton VA Medical Center despite his objections. (Doc. 30 at 11-17).[4] The VA moves for summary judgment on plaintiff's retaliation claim by first arguing that plaintiff has failed to demonstrate that any adverse actions were taken against him to establish his prima facie case of retaliation. (Doc. 29 at 20-27).

To establish the adverse action requirement of his prima facie case of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rogers*, 897 F.3d at 776 (quoting *Burlington Northern*, 548 U.S. at 68). Unlike the discrimination provision of Title VII, the antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id*. Thus, an adverse action showing is "less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim." *Id*. (citing *Laster*, 746 F.3d at 731). However, "[t]he retaliation statutes do not protect an employee 'from those petty slights or minor annoyances that often take place at work and that all employees experience.'" *Fletcher v. U.S. Renal Care, Inc.*, 240 F. Supp. 3d 740, 752 (S.D. Ohio 2017) (quoting *Burlington Northern*,

---

[4] The VA argues in its reply brief that plaintiff did not raise his allegations regarding Mr. Stephen's attempt to deny him sick leave in 2016 and Mr. Stephen's contemplated discipline against him during the EEO administrative process. (Doc. 43 at 7). As evidence, the VA presents the declaration of Matthew Horwitz, Assistant U.S. Attorney, and a true and accurate copy of plaintiff's notice of amendment to his EEO complaint, dated November 30, 2016. (Doc. 43-2). The VA argues that because neither of these allegations were raised in plaintiff's administrative proceedings, they are not properly before the Court. (Doc. 43 at 7). Plaintiff did not reply to this argument in his sur-reply brief. (*See* Doc. 50). The Court agrees that the EEO notice of amendment does not allege that Mr. Stephen attempted to deny plaintiff sick leave in 2016 and Mr. Stephen contemplated discipline against plaintiff. (Doc. 43-2 at 3). Therefore, the Court will not consider these two alleged adverse employment actions in deciding the merits of plaintiff's retaliation claim.

14

548 U.S. at 68), *aff'd sub nom.*, *Fletcher v. U.S. Renal Care, Inc.*, 709 F. App'x 347 (6th Cir.

2017). As the Sixth Circuit recently explained:

> [T]he Supreme Court made clear in *Burlington Northern* that the requirements for a retaliation claim are in fact considerably less stringent. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (rejecting the Sixth Circuit's contrary view). The Court concluded that "Title VII's substantive [antidiscrimination] provision and its antiretaliation provision are not coterminous." *Id.* at 67, 126 S.Ct. 2405. A plaintiff alleging discrimination has to show conduct that "affect[s] the terms and conditions of employment." *Id.* at 64, 126 S.Ct. 2405. But a plaintiff seeking Title VII's protection against retaliation need show only "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S.Ct. 2405 (citations and internal quotation marks omitted). We recently addressed this now decade-old distinction, reiterating that the showing required for a Title VII retaliation claim "is less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim." *Rogers*, 897 F.3d at 775-76.

*Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569-70 (6th Cir. 2019).

Even under a more lenient standard given to Title VII retaliation claims, a reasonable factfinder could not find that the cumulative effect of the alleged actions taken by the VA would dissuade a reasonable worker from filing or pursuing an EEO complaint. Plaintiff received a "excellent" performance rating in 2015 and a "fully successful" performance rating in 2016. While both of these evaluations were lower than previous years, the undisputed evidence shows that plaintiff was not terminated, demoted, or disciplined in any way as a result of these performance evaluations. (Watkins Depo. at 128, 192). Plaintiff did not suffer from any negative financial or professional impacts as a result of these evaluations. *Cf. Fletcher*, 240 F. Supp. 3d at 752 ("[a] reasonable employee might have been dissuaded from continuing to complain about a supervisor's discriminatory conduct after he is issued a disciplinary final

written warning by the supervisor in the presence of and with the approval of higher-level managers.").[5]

In support of his allegation of an increased workload, plaintiff fails to present evidence creating a genuine issue of fact that he was given a heavier workload than Mr. Ferguson such that a reasonable factfinder could find that an employee would be dissuaded from filing an EEO complaint. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. The tracker list that plaintiff presents as evidence is conclusory, flawed, and fails to take several factors into consideration. It ignores that Mr. Ferguson was a junior-level GS-13 employee and plaintiff was a more senior-level GS-14 employee. The list also includes projects assigned on dates that Mr. Stephen was not plaintiff's supervisor, as well as projects assigned to plaintiff prior to Mr. Ferguson's hiring. (Stephen Depo. at 129). In addition, Mr. Stephen testified that plaintiff failed to properly clear assignments from his tracker as they were completed, thereby artificially inflating his workload. (*Id.* at 77). Plaintiff himself acknowledged that he did not always clear assignments from the tracker when they were completed. (Watkins Depo. at 138). Even if the allegation of a heavier workload was credible and supported by the record, it fails to amount to an adverse employment

---

[5] The VA argues that negative performance evaluations do not constitute adverse employment actions unless an employee's wages or salary are impacted as a result. (Doc. 29 at 22). Many of the cases relied on by the VA cite to pre-*Burlington* case law and therefore do not apply the more lenient adverse action standard applicable to Title VII retaliation claims. Specifically, the VA relies on *Blackburn v. Shelby Cty.*, 770 F. Supp. 2d 896, 906 (W.D. Tenn. 2011), which in term relies on *Tuttle v. Metro v. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007). In *Tuttle*, the Sixth Circuit relied on pre-*Burlington* case law, including *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). 474 F. 3d at 322. Most recently, the Sixth Circuit in *Hubbell* acknowledged that the *Hollins* decision, which pre-dated *Burlington*, incorrectly applied the same requirements to Title VII retaliation claims and Title VII discrimination claims. 933 F.3d at 569 n.3.

The Court therefore rejects the VA's argument that plaintiff must present evidence that his evaluations had an adverse impact on his wages or salaries. However, as stated below, the Court still agrees that plaintiff has not established the adverse action requirement of his Title VII retaliation claim.

action as a matter of law. Increased workload or alterations of job responsibilities generally do not constitute a materially adverse employment actions unless accompanied by more severe retaliatory actions. *Lyons v. Vanderbilt Univ.*, No. 3:14-cv-1906, 2015 WL 8668235, at *6 (M.D. Tenn. Dec. 11, 2015) (citing *Burlington* and holding that giving plaintiff three days' worth of work in a single shift did not amount to an adverse employment action).

Plaintiff's assignment to conduct the training at the Dayton VA Medical Center would not dissuade a reasonable worker from reporting incidents of racially offensive language in the workplace. The evidence shows that plaintiff was assigned to conduct the training because he was the individual trainer who was most conveniently located to the Dayton VA Medical Center. (Moseley Depo. at 51). In addition, Mr. Stephen listened to plaintiff's concerns but ultimately did not have anyone else to conduct the training after he exhausted all other possibilities. (Doc. 29-1). Mr. Stephen offered plaintiff the option of finding someone else to fill in on short notice. (*Id.*). Ultimately, plaintiff did not conduct the training after taking sick leave. Plaintiff primarily argues that Mr. Stephen intentionally assigned him the training over his own objections and the objections of the union concerning the relationship with his ex-wife. (Doc. 30 at 16-17). However, "a plaintiff's subjective impression concerning the desirability of one position over another does not control with respect to the existence of an adverse employment action." *Gibbs v. Voith Indus. Servs., Inc.*, 60 F. Supp. 3d 780, 800 (E.D. Mich. 2014) (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004)). Plaintiff's personal objection due to his subjective belief of a potential conflict of interest fails to create a genuine issue of fact as to whether the VA took a materially adverse action against him by assigning him to conduct the Dayton VA Medical Center training.

The 2015 and 2016 performance evaluations, the alleged heavier workload, and the Dayton VA Medical Center training assignment, when viewed singly or in combination, fail to rise to the level of a materially adverse employment action consistent with recent Sixth Circuit cases applying a more lenient standard post-*Burlington*. *Cf. Hubbell*, 933 F.3d at 570 (holding that a reasonable fact finder could find that a number of the alleged actions that the plaintiff testified about would be sufficient, on their own or in combination to dissuade a reasonable worker from filing an EEOC complaint, including: evidence that she was placed under close surveillance, evidence that she was subjected to numerous disciplinary writeups, which she claimed were unjustified and led to her termination, and some evidence that she was written up for unexcused absences even when she provided doctor's notes); *Barrow v. City of Cleveland*, 773 F. App'x 254, 263 (6th Cir. 2019) (holding that plaintiff's reassignment to administrative duty was materially adverse); *Rogers*, 897 F.3d at 776 (holding that a reasonable factfinder could conclude that the plaintiff suffered materially adverse actions based on the "cumulative effect" of certain actions, including referring plaintiff to a fitness-for-duty exam, placing her on leave, escorting her out of the office, removing her badge, and setting her email to send out an automated reply that she was no longer employed and upon her return, offering her an inferior position). Viewed under this standard, the Court concludes that a reasonable factfinder could not find that these actions would dissuade a reasonable employee from filing or pursing an EEO complaint so as to establish the adverse action requirement for a Title VII retaliation claim.

Even if the Court were to conclude that plaintiff suffered adverse employment actions under the above-mentioned circumstances, plaintiff has failed to present sufficient evidence from which a reasonable jury could find in his favor on the other elements of his retaliation claim. Namely, plaintiff has failed to demonstrate a causal connection between reporting the racial slur

incidents and these adverse employment actions. In order to establish a causal link, the plaintiff

must present evidence "sufficient to raise the inference that [his] protected activity was the likely

reason for the adverse action." *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135

(6th Cir. 1990) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).

Plaintiff has failed to present evidence demonstrating a causal link between reporting the

racial slurs and his 2015 evaluation where he received a performance rating of "excellent" from

Mr. Stephen. As an initial matter, the Court notes that plaintiff testified that he was "almost

sure," but not positive on whether he reported the racial slurs allegedly used by Ms. Levesque

before his October 2015 evaluation. (Watkins Depo. at 108-09). Plaintiff has not presented

evidence beyond his own uncertain belief to demonstrate that he actually reported the racial slur

incidents before the 2015 evaluation. *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, 900 F.3d 818,

823 (6th Cir. 2018) (a party may not avoid summary judgment by resorting to speculation or

conjecture). In addition, Mr. Stephen testified that he first learned of the racial slur incidents at

the informal mediation phase of plaintiff's EEO complaint in January 2016 when he was no

longer a supervisor of plaintiff or anyone else (Stephen Depo. at 22, 24) and therefore he was not

aware of the reports when conducting plaintiff's 2015 performance evaluation.

Plaintiff has also failed to present evidence demonstrating a causal connection between

reporting the racial slurs and the other alleged employment actions.[6] Mr. Stephen first learned of

---

[6] The Court rejects the VA's argument that plaintiff did not engage in protected activity. Section 2000e-
3(a) prohibits retaliation against an employee who has "opposed" any practice by the employer made unlawful under
Title VII (the "opposition clause") or against an employee who has "participated" in any manner in an investigation
under Title VII (the "participation clause"). *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000)
(citations omitted). Examples of "opposing" conduct that may be protected by Title VII include "complaining to
anyone (management [or] other employees. . .) about allegedly unlawful practices," although the manner of
opposition must be "reasonable." *Id.* at 579 (citing *EEOC Compliance Manual*, (CCH) ¶ 8006). As such, the Court
finds that plaintiff engaged in protected activity by making an internal complaint regarding the use of racially
offensive language in the workplace, purportedly to Ms. Moseley, although he cannot recall the exact date.
(Watkins Depo. at 68).

plaintiff's internal complaint in January 2016. He did not assign plaintiff to conduct the Dayton VA Medical Center training until June 2016 (six months later) and did not conduct plaintiff's 2016 performance evaluation until October 2016 (ten months later). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 305-06 (6th Cir. 2012) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (quoting *Mickey*, 516 F.3d at 525). In light of the distant temporal proximity between when Mr. Stephen learned of plaintiff's complaint and when Mr. Stephen required plaintiff to conduct the training and conducted plaintiff's 2016 performance evaluation, plaintiff was obligated to adduce other evidence of retaliatory conduct to establish a causal connection. Plaintiff has failed to present additional evidence to connect his complaint to these actions. In light of these circumstances, temporal proximity alone is insufficient to establish a causal link between plaintiff's complaint of racially offensive language in the workplace and his 2015 and 2016 performance evaluations, the training assignment, and the alleged increased workload.[7]

Finally, even if plaintiff could establish a prima facie case of retaliation, the VA has asserted a legitimate, non-retaliatory reason for its actions. Plaintiff received positive, but not perfect, evaluations in 2015 and 2016 because he failed to demonstrate outstanding performance in all areas. Plaintiff was assigned to conduct the Dayton VA Medical Center training because

---

[7] As stated above, the Court finds plaintiff's purported evidence of an increased workload (the assignment tracker printout) to be flawed and insufficient to meet his burden in opposing the VA's motion for summary judgment.

he was the only employee available at the time and lived in closest proximity to the training. Further, plaintiff has not produced any evidence to show that the VA's actions and reasons were a mere pretext for unlawful retaliation. *Crawford*, 773 F. App'x at 827. Based on the record before the Court, no reasonable jury could determine that but for plaintiff's complaint and EEO filing, the VA would not have issued similar performance reviews, assigned plaintiff to conduct a training at the Dayton VA Medical Center, and assigned plaintiff the same workload. The VA is therefore entitled to summary judgment in its favor on plaintiff's retaliation claim.

**B. Hostile Work Environment Claims**

Plaintiff alleges that he was subjected to a hostile work environment in retaliation for his complaints of racially offensive language in the workplace. Plaintiff also alleges that he was subjected to a racially hostile work environment.

In order to establish a prima facie case of a hostile work environment under Title VII based on either race or retaliation, a plaintiff must show: (1) he is a member of a protected class; (2) he was subjected to unwelcome racial or retaliatory harassment; (3) the harassment was based on race or the employee's protected activity; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *Willey v. Slater*, 20 F. App'x 404, 406 (6th Cir. 2001) (retaliatory hostile work environment claim); *see also Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (racially hostile work environment claim). A hostile work environment claim brought under 42 U.S.C. § 1981 is analyzed under the same standard as claims brought under Title VII. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). A plaintiff must demonstrate that the workplace is "permeated with [retaliatory or racial] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." *Moore v. Abbott Labs.*, 780 F. Supp. 2d 600, 632 (S.D. Ohio. 2011) (quoting *Russell v. Univ. of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008)).

Hostile work environment claims involve consideration of both objective and subjective components. Objectively, a plaintiff must show that the conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive. . . ." *Id.* Subjectively, a plaintiff must show that he subjectively perceived the environment to be abusive. *Id.* The Court considers the totality of the circumstances in determining whether the work environment was hostile, including relevant factors such as: (1) the frequency of the harassing conduct; (2) the severity of the harassing conduct; (3) whether the harassing conduct was physically threatening or humiliating, or merely offensive speech; and (4) whether the harassing conduct unreasonably interfered with the employee's work performance. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Simple teasing, . . . offhand commends, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 632-33 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The conduct must be "extreme." *Id.* at 633.

Plaintiff has failed to establish that the alleged retaliatory harassment was severe or pervasive to rise to the level of a hostile work environment. Plaintiff has not shown that the performance reviews reflecting "excellent" and "fully successful" ratings on two occasions created a retaliatory work environment. These evaluations had no adverse impact on plaintiff's salary or his professional development. Nor has plaintiff presented evidence showing that he was actually assigned more work than his Caucasian counterpart, as explained above. In addition, plaintiff has not demonstrated how being assigned to conduct the Dayton VA Medical

Center training was "intimidating, hostile, or offensive." The undisputed evidence shows that Mr. Stephen listened to plaintiff's concerns about a professional conflict of interest with his ex-wife and discussed these concerns with both the union and the Director of the Dayton VA Medical Center. It is also undisputed that Mr. Stephen attempted to locate another individual to conduct the training but was unsuccessful and offered plaintiff the option of finding his own substitute. Plaintiff has not presented evidence to dispute that he was the only person available to conduct the training. Plaintiff ultimately did not conduct the training session after Mr. Stephen granted his sick leave request. While a reasonable employee might have been "surprised, taken aback, slightly embarrassed, or disappointed about some of the incidents," under the objective standard, the alleged retaliatory harassment was not severe, extreme, or humiliating as a matter of law. *Moore*, 780 F. Supp. 2d at 633 (among other actions that plaintiff complained of, receiving downgraded performance reviews, being assigned to "make introductory comments at trainee graduations without prepared notes on more than one occasion," being assigned to sell older medical sales products and products that did not sell well, and being assigned tight deadlines that caused the plaintiff to work late on one occasion did not amount to severe or pervasive retaliatory harassment creating a hostile work environment).

Plaintiff has likewise failed to establish that he was subjected to a racially hostile work environment that was severe or pervasive. Plaintiff identifies the following racially offensive statements allegedly made by Ms. Levesque[8] in the workplace to support his racially hostile work environment claim: (1) referring to another employee as a "nigger" in plaintiff's presence; (2) likening plaintiff to an "ape" or "monkey" at an after-hours work function; (3) referring to Mr. Woodard as a "nigger," which Ms. Jones witnessed; and (4) referring to Ms. Tullis as a

---

[8] The Court acknowledges that there is a dispute as to whether these statements originated from Ms. Levesque or whether she was offended and repeated them for the purposes of reporting.

"monkey." (Doc. 30 at 7-8). In addition, Ms. Best stated that Ms. Levesque "frequently" used the "N-word" in the workplace. (Best Affidavit at ¶ 5).

The Sixth Circuit has established a high bar in its line of decisions for determining what amounts to actionable discriminatory conduct under a hostile work environment theory. *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 980 (2018) (citing *Williams v. CSX Transp. Co*., 643 F.3d 502, 512 (6th Cir. 2011); *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014); *Clay v. United Parcel Serv., Inc*., 501 F.3d 695, 707-08 (6th Cir. 2007)). The Sixth Circuit has summarized this line of cases as follows:

> [T]his court has found even offensive and bigoted conduct insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements. *See, e.g.*, *Williams*, 643 F.3d at 506, 513 (finding no hostile work environment where defendant "call[ed] Jesse Jackson and Al Sharpton 'monkeys' and [said] that black people should 'go back to where [they] came from'" among other racist comments); *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014) (no hostile work environment where plaintiff was subjected to race-based comments and his supervisor stood behind him and made a noose out of a telephone cord); *Clay*, 501 F.3d at 707-08 (fifteen racially-motivated comments and instances of disparate treatment over a two-year period were isolated, not pervasive, and therefore not actionable under Title VII).

*Phillips*, 854 F.3d at 328. Occasional offensive utterances do not rise to the level required to create a hostile work environment. *Id.* at 327. Although conduct must be extreme to amount to a hostile work environment, a "work environment viewed as a whole may satisfy the legal definition of an abusive work environment . . . even though no single episode crosses the Title VII threshold." *Bradley v. Arwood*, 705 F. App'x 411, 422 (6th Cir. 2017) (internal quotations omitted). Racially derogatory comments by fellow employees that a plaintiff learned of second-hand can contribute to a hostile work environment and may be considered by the trier of fact as long as they were known by the employee at the time of his employment. *Robinson v. Coca-Cola Enterprises, Inc*., No. 1:06-cv-371, 2007 WL 2948869, at *7 (S.D. Ohio Oct. 9, 2007)

24

(citing *Quanex Corp.*, 191 F.3d at 661; *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 262 (6th Cir. 2001)).

As an initial matter, plaintiff has not presented evidence showing that he was aware of the racial slurs made by Ms. Levesque to Mr. Woodard and Ms. Tullis at the time they were made during the course of his employment. *Wanchik*, 6 F. App'x at 262 (for the accounts of others to be relevant, the plaintiff must have been aware of these incidents during his employment, even if indirectly). In addition, any allegations that Ms. Levesque "frequently" used racial slurs in the workplace is insufficient to create a genuine dispute of fact on a hostile work environment claim. *Powell-Pickett v. AK Steel Corp.*, 904 F. Supp. 2d 767, 776 (S.D. Ohio 2012) (noting that a "hostile work environment plaintiff needs to allege sufficient specificity as to the time, place, and context of the alleged discriminatory statements to create a genuine issue of material fact") (internal quotation omitted), *aff'd sub nom.*, *Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347 (6th Cir. 2013). Thus, the Court is left with determining whether the two racial slurs allegedly used by Ms. Levesque in plaintiff's presence are severe and pervasive enough to constitute a racially hostile work environment. The Court concludes that they are not.

Ms. Levesque's alleged use of the word "nigger" in plaintiff's presence and alleged likening of plaintiff to a monkey, if true, are certainly offensive utterances and condemnable. However, consistent with the above-cited precedent, these two incidents fail to demonstrate that the VA was a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter conditions of [his] employment and create an abusive working environment." *Harris*, 510 U.S. at 21. *See also Phillips*, 854 F.3d at 327; *Williams*, at 512; *Reed*, 556 F. App'x at 432; *Clay*, 501 F.3d at 707-08. Plaintiff has not introduced evidence on summary judgment to show that these isolated incidents, taken together,

constituted an environment that was severe or pervasive, nor has he presented evidence showing that these comments were a common occurrence and unreasonably interfered with his work performance. On the contrary, other than Ms. Levesque's comments, plaintiff acknowledged that he never heard anyone else use racial slurs in over twenty-five years at the VA. (Watkins Depo. at 84). In addition, the comments were allegedly made by a low-level employee and were not made in the presence of a supervisor. Upon learning of racially offensive remarks, which she believed at the time originated from Ms. Best, as well as other issues in the workplace, Ms. Moseley requested a formal-fact finding investigation in February 2015 that was conducted by Evester Edd. (Doc. 29-1 at 54-55; Moseley Depo at 21).

Accordingly, plaintiff has failed to establish a prima facie case on his hostile environment claims based on race and retaliation. The VA is therefore entitled to summary judgment on plaintiff's hostile work environment claims.

**V. Conclusion**

Based on the foregoing, it is **ORDERED** that defendant's motion for summary judgment (Doc. 29) be **GRANTED** and this case is **CLOSED** on the docket of this Court.

Date: _____9/25/19_____

Karen L. Litkovitz
United States Magistrate Judge